The CITY OF INGLESIDE,
Texas, Appellant,

v.

George KNEUPER, Appellee.

No. 3–88–138–CV.

Court of Appeals of Texas,
Austin.

March 29, 1989.

Rehearing Denied May 3, 1989.

Frank E. Weathered, Brin & Brin, Corpus Christi, Robert D. Stokes, Flahive, Ogden & Latson, Austin, for appellant.

Thomas R. Hays, Gary, Thomasson, Hall & Marks, Corpus Christi, for appellee.

Before SHANNON, C.J., and EARL W. SMITH * and JONES, JJ.

JONES, Justice.

This appeal arose out of a suit filed by George Kneuper, appellee, under what has been dubbed the Texas "Whistleblower Act," Tex.Rev.Civ.Stat.Ann. art. 6252–16a (Supp.1989), after he was fired from his job as Director of Public Works for the City of Ingleside, appellant. The trial court initially reinstated Kneuper to his job through the granting of a temporary injunction. Following a trial on the merits in which the jury answered all questions in Kneuper's favor, the trial court granted judgment for Kneuper for damages and permanent injunctive relief. We will modify the judgment and affirm it as modified.

On March 10, 1987, Kneuper reported to the Texas Rangers what he believed to be criminal activity in connection with building inspections and the City's former building inspector, who had already been fired at the time of the report. On March 27, Kneuper was terminated by the city manager. At trial, the City argued that Kneuper had been terminated for negligence in the performance of his duties, insubordination, and the willful violation of personnel rules and regulations. Kneuper contended that he had been fired for reporting the violations of law.

The Whistleblower Act provides as follows, in pertinent part:

Sec. 2. A state or local governmental body may not suspend or terminate the employment of, or otherwise discriminate against, a public employee who reports a violation of law to an appropriate law enforcement authority if the employee report is made in good faith.

&ast; &ast; &ast; &ast; &ast; &ast;

Sec. 4. (a) A public employee who sues under this Act may recover:

(1) actual damages;

(2) exemplary damages;

(3) costs of court; and

(4) reasonable attorney's fees.

(b) In addition to amounts recovered under Subsection (a) of this section, a public employee whose employment is suspended or terminated in violation of this Act is entitled to:

(1) reinstatement in his former position;

(2) compensation for wages lost during the period of suspension or termination; and

(3) reinstatement of any fringe benefits or seniority rights lost because of the suspension or termination.

Excluding sub-questions relating to attorney's fees, which are not in dispute, the jury answered the following questions:

#### QUESTION 1

Was George Kneuper's report of a violation of law by Keith Eppard to the Texas Ranger the reason or one of the reasons that the City terminated George Kneuper's employment? [1]

Answer:  Yes

#### QUESTION 2

Was George Kneuper's report of a violation to the Texas Ranger made in good faith?

You are instructed that "good faith" means honesty in fact in the conduct concerned. You are to consider George Kneuper's actual belief as long as that belief was not unreasonable.

Answer:  Yes

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex.Gov't.Code Ann. § 74.003 (1988).

1. Although the City does not complain about the phrasing of this question in terms of "the reason or one of the reasons," the better practice would be to phrase the question in general terms: "Do you find that Defendant terminated Plaintiff's employment for reporting a violation of law . . .?"

## QUESTION 3

What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would reasonably and adequately compensate George Kneuper for damages sustained as a result of the city's termination of George Kneuper's employment?

Consider the following elements of damages, if any, and none other:

(a) Mental anguish and suffering in the past.

Answer: $50,000

(b) Mental anguish and suffering which, in reasonable probability, he will suffer in the future.

Answer: $36,000

(c) Loss of earnings in the past.

Answer: $600

(d) Loss of earning capacity which, in reasonable probability, he will suffer in the future.

Answer: $75,000

(e) Retirement and other employees benefits to which George Kneuper would have been entitled had he continued to work for the City of Ingleside, Texas.

Answer: $108,000

## QUESTION 4

What sum of money, if any, do you find from a preponderance of the evidence that George Kneuper should be awarded against the City as exemplary damages?

"Exemplary Damages" means an amount which you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount which you may have found as damages in response to QUESTION 3.

Answer: $300,000

On the basis of these answers, the trial court awarded Kneuper judgment for $344,600 actual damages (which included attorney's fees through trial), $300,000 exemplary damages, prejudgment interest, and appellate attorney's fees, and permanently enjoined the City from terminating Kneuper's employment for any conduct occurring prior to the date of the judgment.

In five points of error, the City attacks the judgment for failing to submit, as a predicate to the award of exemplary damages, a question inquiring whether the City acted with malice; for awarding Kneuper a total of $183,000 for future economic loss while at the same time enjoining the City from terminating his employment; for having legally and factually insufficient evidence to support the jury's answers to questions 3(d) and 3(e), regarding future economic loss; for having legally and factually insufficient evidence to support the jury's answers to questions 3(a) and 3(b), regarding past and future mental anguish; and for having legally and factually insufficient evidence to support the jury's answer to question 4, regarding exemplary damages.

The City's first point of error raises the issue whether the Act requires, as a prerequisite to an award of exemplary damages, a finding that it acted with malice in terminating Kneuper's employment. Our primary goal in resolving this issue is the search for the Legislature's intent, which we must, if possible, determine from the language of the Act itself. *Crimmins v. Lowry*, 691 S.W.2d 582 (Tex.1985). Kneuper suggests that the language of the Act is clear and unambiguous. Because malice is not expressly stated to be a prerequisite to an award of exemplary damages, he argues that it is not required. A proper analysis, however, is not so simple.

In order to ascertain legislative intent, a statute will be construed in the light of the entire body of law existing at the time of its enactment, including the common law. *In re Estates of Carrigan*, 517 S.W.2d 817 (Tex.Civ.App.1974, no writ). *See generally* 2A Singer, Sutherland Statutory Construction § 50.01 *et seq.* (4th ed. 1984). From the earliest Texas cases in which exemplary damages were recognized, extraordinarily reprehensible conduct has been required. *See* Demarest, *The History of Punitive Damages in Texas*, 28 S.Tex.L.Rev. 535 (1987). Possibly the first such case in Tex-

as was *Graham v. Roder,* 5 Tex. 141 (1849), in which the Supreme Court held:

> Where either of the elements of fraud, malice, gross negligence, or oppression "mingle in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, blends together the interests of society and the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender. This rule seems settled in England and the general jurisprudence of this country."

*Id.* at 149 (quoting from Sewg.Meas.Dam., at 38–9). Two years later, the Supreme Court again approved the recovery of exemplary damages if the injury was "tainted with fraud, malice, or willful wrong." *Cole v. Tucker,* 6 Tex. 266, 268 (1851). Except for some fluctuations in the definition of "gross negligence," culminating in the Supreme Court's decision in *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex. 1981), the prerequisites are essentially the same today. *See, e.g., Dennis v. Dial Finance & Thrift Co.,* 401 S.W.2d 803, 805 (Tex.1966); *InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 907–08 (Tex.App. 1987, no writ).

Hence, the Legislature's allowance of exemplary damages in the Act must be viewed against the backdrop of a lengthy history, both at common law generally and in Texas, of requiring malice, fraud, a willful and wanton act, or gross negligence as a prerequisite to an award of such damages.

In our view, the failure of the Legislature to expressly list a finding of malice as a prerequisite to a recovery of exemplary damages under the Act is not dispositive. Section 4(a)(1) lists no prerequisites for a recovery of *actual* damages either, but there is little doubt that such damages would not be recoverable without a finding that they *resulted from* or were *proximately caused by* a violation of the Act. *See, e.g., McKinley v. Stripling,* 763 S.W. 2d 407 (Tex.1989), in which the Supreme Court rejected a similar argument as applied to the Medical Liability and Insurance Improvement Act, Tex.Rev.Civ.Stat.Ann. art. 4590i (Supp.1989):

> Although the statute does not mention the term "proximate cause," this is not dispositive of the issue before us. Before the statute was enacted, no one disputes that Texas law required that an issue on proximate causation be submitted. [Citation omitted.] Nothing in the statute subsequently enacted indicates that the legislature intended to eliminate this requirement. In the absence of any legislative history suggesting that juries no longer need to find proximate cause in informed consent cases, the statute's omission of such an element is inconclusive.

As in *McKinley,* the legislative history of the Whistleblower Act contains no suggestion that the traditional prerequisites for an award of exemplary damages were intentionally or consciously omitted. Accordingly, their omission is not conclusive of legislative intent. Indeed, under Kneuper's construction, section 4(a) of the Act would not even require a *violation* of the Act to recover exemplary damages, since it states only that a public employee "who *sues* under this Act may recover...." (Emphasis added.) Far from indicating a conscious awareness of omitted prerequisites, which might imply that the omission was intentional, the language of the Act demonstrates a consistent omission of *all* formal prerequisites.

Nor does the mere statement that exemplary damages are recoverable suggest that traditional requirements for such damages are no longer needed. At least eight other Texas statutes provide for a recovery of exemplary damages without an express requirement of malice.[2] Although this pre-

---

**2.** Tex.Bus. & Com.Code Ann. § 18.09 (1987) (credit services organizations prohibited from various acts); Tex.Civ.Prac. & Rem.Code Ann. § 123.004 (1986) (victim of interception of communication may sue); Tex.Prop.Code Ann. § 26.013 (Supp.1989) (person who uses a deceased individual's name, voice, etc. is liable); Tex.Rev.Civ.Stat.Ann. art. 4442c, § 16(i) (Supp.

cise question has not been addressed under those statutes, there is no indication in any of them that the traditional requirement of malice is somehow inherent in the prohibited conduct, such that a finding of malice is unnecessary.

Kneuper points to the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.41 *et seq.* (1987), as containing similar statutory language which has been construed *not* to require knowledge or intent. *See Pennington v. Singleton,* 606 S.W.2d 682, 689–90 (Tex.1980). There are, however, important distinctions between the two acts. First, when *Pennington* was decided the DTPA spoke in terms of a consumer recovering "three times the amount of actual damages." Although statutory treble damages may "amount to" exemplary damages, *Birchfield v. Texarkana Memorial Hospital,* 747 S.W.2d 361, 367 (Tex.1987), there are simply no long-standing prerequisites for the recovery of such "treble damages" as there are for the recovery of "exemplary damages." Second, the Supreme Court in *Pennington* considered it significant that several of the subdivisions of the section 17.46 "laundry list" did include an intent requirement, indicating that the Legislature must have been aware of that question and making it likely that the omission of a *general* intent requirement was intentional. *Pennington,* 606 S.W.2d at 689. As discussed above, the indications in the Whistleblower Act are precisely to the contrary. Finally, the DTPA at least provided that such damages were available to a consumer "who prevails" in a suit filed under that section.

Moreover, at the time the Whistleblower Act was passed in 1983, it appears to have been commonly thought that "[c]ities and other governmental agencies generally will not be liable for punitive damages under Texas law. This rule is in accord with the majority rule in the United States." Demarest, *The History of Punitive Damages in Texas,* 28 S.Tex.L.Rev. 535, 560 (1987). Even when the Texas Supreme Court diverged from that rule in *City of Gladewater v. Pike,* 727 S.W.2d 514 (Tex.1987), it recognized that strong policy reasons militate against a recovery of exemplary damages from a municipality. The court concluded that "any exception to be carved out of the general rule of non-liability must create an *exceedingly* difficult burden to meet." *Id.* at 524 (emphasis in original). Accordingly, in 1983 there was a logical reason for the Legislature to have included in the Act a general provision for the recovery of exemplary damages: without such a provision, it would likely have been determined that such damages were not recoverable at all from the offending governmental body.

Nor is interpretive assistance available from other jurisdictions. At least five other states have whistleblower acts of their own.[3] Only in California, however, are exemplary damages expressly allowed, and there only "where the acts of the offending party are proven to be malicious." Calif. Gov't Code § 10548(c) (Supp.1989).

■ We conclude that the plain language of the Act, viewed with reference to the whole body of law in existence at the time of its enactment, including the common law, does not permit the construction that the Legislature intended to do away with the long-standing requirement that an award of exemplary damages be predicated

1989) (cause of action against an institution that terminates a person's employment for reporting the abuse or neglect of a nursing home patient); Tex.Rev.Civ.Stat.Ann. art. 4495b, § 5.06(q)(1) (Supp.1989) (cause of action against an entity for terminating a person's employment for reporting to the Board of Medical Examiners); Tex.Rev.Civ.Stat.Ann. art. 5069–6A.18(3) (Supp. 1989) (owner of real property on which a manufactured home is located is liable if they refuse to allow creditor with a security interest on home to repossess); Tex.Rev.Civ.Stat.Ann. art. 6252–17, § 2A (Supp.1989) (a person who knowingly makes public a recording of a meeting

that was closed under authority of the Open Meetings Law is liable); Tex.Code Cr.P.Ann. art. 18.20, § 16(a) (Supp.1989) (victim of interception of communication may sue).

**3.** Conn.Stat.Ann. § 31–51m (Supp.1988); Me. Rev.Stat.Ann., Tit. 26, § 831 *et seq.* (1988); Mich.Comp.Laws Ann. § 15.361 *et seq.* (1981 & Supp.1988); Calif.Gov't Code § 10548 (Supp. 1989) (public employees only); Ill.Stat.Ann. ch. 127, ¶ 63b119c.1. (Supp.1988) (state employees only).

on a finding of malice, willful and wanton conduct, fraud, or gross negligence.

Even if it could be said that the Act was ambiguous in this regard, we would be led to the same conclusion. As both parties recognize, we are required to construe the Act strictly, whether because it is partially a penal statute, *Board of Ins. Com'rs v. Great Southern Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (1951), creates a liability unknown to the common law, *Dutcher v. Owens*, 647 S.W.2d 948, 951 (Tex.1983), or is in derogation of sovereignty. *Adams v. Harris County*, 530 S.W.2d 606, 608 (Tex.Civ.App.1975, writ ref'd n.r.e.), *appeal dism'd*, 429 U.S. 803, 97 S.Ct. 34, 50 L.Ed.2d 63 (1976).

Kneuper contends, however, that a strict construction favors his position by prohibiting the implication of additional statutory requirements beyond what is expressly stated. Kneuper has misconstrued the doctrine. It is the scope of a statute's punitive coverage that must be limited to the express terms in a strict construction. Under the doctrine of strict construction "the operation of the law will then be confined to cases which plainly fall within its terms as well as its spirit and purpose," *Coastal States Gas Producing Co. v. Pate*, 158 Tex. 171, 309 S.W.2d 828, 831 (1958). We "may not presume that the Legislature intended that the punishment authorized therein should extend beyond what is expressly stated." *Carbide International, Ltd. v. State*, 695 S.W.2d 653, 659 (Tex. App.1985, no writ). *See generally* 2A Singer, Sutherland Statutory Construction, § 58.02, at 708–09 (4th ed. 1984) ("What is called a liberal construction is ordinarily one which makes a statute apply to more things or in more situations than would be the case under a strict construction."). Therefore, to the extent there was any doubt that a finding of malice remained as a prerequisite to an award of exemplary damages under the Act, a strict construction would require us to resolve it in favor of limiting the scope of such damages. This, in turn, would require a determina-

tion that the Act did *not* eliminate the prerequisite of malice.

■ Thus, in view of the City's proper objection to the omission of a malice question to the jury, the trial court was obligated to submit such a question, unless malice was conclusively shown. Having reviewed the record and concluded that malice was not conclusively shown, we hold that the failure to submit the question was harmful error. The City's first point of error is sustained.

In their second point of error, the City complains that the trial court's award of $75,000 for loss of future earning capacity and $108,000 for "retirement and other employee's benefits to which George Kneuper would have been entitled had he continued to work for the City of Ingleside" was inconsistent with the court's reinstatement of Kneuper to his former position, amounting to a double recovery for the same injury.

■ With respect to the $75,000 award for loss of future earning capacity, the award here was *not* for future earnings, but rather for earning *capacity*. It is settled law in Texas that a party who returns to his former job, even making the same wage as before, is not precluded thereby from recovering for loss of earning capacity. *Thomas v. Jenkins*, 481 S.W.2d 464 (Tex.Civ.App.1972, writ ref'd n.r.e.); *Mikell v. La Beth*, 344 S.W.2d 702 (Tex.Civ.App. 1961, writ ref'd n.r.e.). Accordingly, this award was not inconsistent with the reinstatement of Kneuper to his job.

■ The $108,000 award for benefits to which Kneuper "would have been entitled" had he continued to work for the City is, however, more in the nature of future earnings, i.e., benefits that would accrue to Kneuper as a result of his continued employment.[4] Citing the language of the Act, however, Kneuper argues that section 4(b) expressly authorizes a recovery of reinstatement to job and benefits "in addition

---

4. In his brief, Kneuper explains that the $108,-000 sum found by the jury was apparently arrived at by multiplying $1,000 per month, the amount to which he would be entitled upon retiring, by 108, the number of months remaining in his life expectancy at age sixty-five.

to" the amounts authorized by section 4(a). Kneuper is correct in his analysis of the Act: the Legislature obviously intended that reinstatement of job and benefits could be recovered *in addition to* damages. However, Kneuper overlooks that section 4(b)(3) permits recovery only of rights and benefits *"lost* because of the suspension or termination.'' (Emphasis added.) In the instant case, question 3(e) submitted to the jury did not inquire about "lost" benefits, but only about benefits which Kneuper would have earned if he had continued to work for the City of Ingleside.[5] With the reinstatement, it is clear that Kneuper did not lose any such rights or benefits. Accordingly, an award of *those* benefits in addition to reinstatement did allow a recovery of inconsistent relief. While the Legislature may have intended that both damages and reinstatement be recoverable, we hold that it did not intend to allow a double recovery for the same injury.[6] We therefore sustain this portion of the City's second point of error.

Regarding the question of which of the two inconsistent forms of relief—reinstatement of benefits or damages for the loss thereof—should be eliminated, we conclude that by seeking and obtaining a temporary injunction which effectively reinstated Kneuper to his former position, he irrevocably elected the remedy of reinstatement. *Kingsbery v. Phillips Petroleum Co.,* 315 S.W.2d 561 (Tex.Civ.App.1958, writ ref'd n.r.e.). *See also Bocanegra v. Aetna Life Insurance Co.,* 605 S.W.2d 848 (Tex.1980). Accordingly, we hold that the trial court erred in including in the actual damages award the sum of $108,000 found by the jury in answer to question 3(e).

In point of error three, the City asserts legal and factual insufficiency of the evidence to support the jury's answers to

question 3(d), concerning lost earning capacity, and question 3(e), concerning employee benefits; the point also attacks the jury's answers to these questions as being excessive. In view of our holding that the award for employee benefits should not have been made, we will address only those arguments in point of error three that relate to the jury's answer regarding lost earning capacity.

In considering a "no evidence" point, the reviewing court must reject all evidence contrary to the jury's findings and consider only the facts and circumstances which tend to support those findings. *Renfro Drug Co. v. Lewis,* 149 Tex. 507, 235 S.W. 2d 609 (1950). In reviewing factual sufficiency points of error, the court considers all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

Virtually every discussion of the amount and type of evidence needed to sustain an award for lost earning capacity has come in the context of a personal injury suit. Nonetheless, they are of significant value in determining the present question. For example, the following oft-quoted passage from *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943), appears equally applicable to cases other than personal injury:

> In a personal injury suit the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury. However, the verdict must be based on something more than mere conjecture. It must be an intelligent judgment, based upon such facts as are available. Even where the

---

5. The wording for this question apparently came verbatim from *Carnation Co. v. Borner,* 610 S.W.2d 450 (Tex.1980), a case concerning the prohibition of retaliatory discharge under the Worker's Compensation Act. In *Borner,* however, the plaintiff had neither sought nor obtained reinstatement to his former position.

6. Without attempting to state the obvious, we also note that "wages lost during the period of

suspension or termination," compensation for which is authorized by section 4(b)(2), and "benefits or ... rights lost because of the suspension or termination," reinstatement of which is authorized by section 4(b)(3), would not be simultaneously recoverable under section 4(b) and also as "actual damages" under section 4(a).

injury is of such a serious and permanent nature that loss of earning capacity is the necessary result, proof is required to show the extent and amount of the damages. [Citation omitted.] No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible. [Citation omitted.] Under this rule the required certainty of the proof will necessarily vary.

*See also Bonney v. San Antonio Transit Co.*, 160 Tex. 11, 325 S.W.2d 117 (1959); *Southwestern Freight Lines v. McConnell*, 254 S.W.2d 422 (Tex.Civ.App.1952, writ ref'd).

Although referring to a recovery for loss of future wages, not earning capacity, the Supreme Court in *Carnation Co. v. Borner, supra*, 610 S.W.2d at 454, held that the amount of such future damages in a wrongful termination suit must be proved with "reasonable certainty."

Essentially all of the evidence regarding lost earning capacity came from three witnesses. After reciting his educational background, Kneuper testified that he was earning almost $24,000 a year working for the City of Ingleside, that he hoped to continue working in municipal employment as a public works director in a larger city or as a city manager in a smaller city, and that significant salary increases in municipal employment are generally obtained by moves to different cities. He said that his firing would cause him two problems in seeking other employment: first, that he would be "branded" as the one who had "squealed," and second, that he would be known as someone who had sued his employer. Edward Martin, former city manager of Corpus Christi, testified that the job market in municipal employment is currently very tight, that "generally speaking" most prospective employers would be "scared off" by someone who had sued their former employer, and that someone labelled a "troublemaker" might have trouble "getting through the initial phases of the [employment] system." Professor Carl Hansen, a vocational rehabilitation counselor and teacher at the University of Texas,

testified about various types of jobs that Kneuper would be qualified for, both within and without city government, and their respective salaries; and that, as a result of his "career interruption," Kneuper had suffered a loss of future earning capacity of between $146,004 and $190,440.

The testimony of Kneuper and Edward Martin was clearly sufficient to support a finding that Kneuper had suffered *some* loss of earning capacity. Viewed in the light most favorable to the verdict, the evidence and reasonable inferences therefrom indicate that, even with reinstatement, Kneuper would likely experience difficulty advancing to higher-paying positions as quickly as he otherwise would have. Professor Hansen's testimony, on the other hand, gives some guidance as to an *amount* of damages. It is true that Hansen's testimony merely establishes a maximum amount of damages, i.e., the range of damages to which he testified is based on an assumption that, in the absence of his firing, Kneuper would have immediately obtained one of the higher-paying positions to which he eventually aspired, and on the further assumption that, as a result of his firing, Kneuper will never advance to any higher-paying position. Both of those circumstances may be unlikely. However, since it would have been impossible to prove *how much* more slowly Kneuper will advance than he otherwise would have, Hansen's testimony probably provided the highest degree of certainty to which the case was susceptible. The jury, perhaps recognizing the weakness in Hansen's assumptions, found only $75,000 in lost earning capacity. We cannot say that their answer was based solely on conjecture. Accordingly, we conclude that the evidence was sufficient, legally and factually, to support the award based on the jury's verdict. This discussion and holding also dispose of the City's contention regarding the excessiveness of the jury's answer. Point of error three is overruled.

In point of error four, the City asserts legal and factual insufficiency of the evidence to support the jury's answers to

questions 3(a) and 3(b), concerning damages for past and future mental anguish, and also argues that the amounts found by the jury in answer to those questions are excessive.

Many cases state the rule that in order to establish mental anguish a plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger. *See, e.g., Town East Ford Sales, Inc. v. Gray,* 730 S.W.2d 796 (Tex.App.1987, no writ); *Roberts v. U.S. Home Corp.,* 694 S.W.2d 129 (Tex.App.1985, no writ); *K–Mart Corp. Store No. 7441 v. Trotti,* 677 S.W.2d 632 (Tex.App.1984), writ ref'd n.r.e., 686 S.W.2d 593 (Tex.1985). The rule has also been stated as follows:

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Trevino v. Southwestern Bell Telephone Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.1979, no writ).

The above decisions must, however, be viewed in light of recent Supreme Court cases easing the recovery of mental anguish damages. *See, e.g., Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983) (overturning the "pecuniary loss rule" which had, for over a century, limited a surviving parent's damages in an action for the death of a child under the Texas Wrongful Death Act to the pecuniary value of the child's services and financial contributions, minus the cost of his care, support, and education); *Moore v. Lillebo,* 722 S.W.2d 683, 688 (Tex.1986) (removing the "physical manifestation" requirement in cases brought under the Wrongful Death Act, and defining "mental anguish" in such cases as "the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of the family member"); *St. Elizabeth Hospital v. Garrard,* 730 S.W.2d 649 (Tex.1987) (removing the physical manifestation requirement in all common law actions for negligent infliction of mental anguish). These cases have not, on the surface, affected the above-quoted restrictions on what may constitute mental anguish. At the very least, however, they indicate that some of the traditional barriers to a recovery of mental anguish damages are being dismantled.

In the present case, the jury found $50,000 for past mental anguish and $36,000 for future mental anguish. Kneuper's wife testified that immediately after he was fired there was "total panic" and "great fear," because they had seven children and no way to support them. This testimony, in and of itself, is sufficient to show that Kneuper suffered *some* mental anguish. Mrs. Kneuper also testified that, even after he was temporarily reinstated to his job, her husband appeared to be more nervous and irritable; that he was "shorter" with the children than before; and that he would "bite his nails and pace the floor." Kneuper testified that the experience had been "difficult"; that, since being reinstated, his colleagues had "worked around" him, not always keeping him informed on projects, which had been "frustrating"; that one of his sons took "some ribbing" at school; and that he and his family had not been able to take a vacation the preceding summer because he was afraid to take time off.

We hold that the above is legally and factually sufficient evidence to support the award of past mental anguish. Accordingly, under the standard enunciated in *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986), we also hold that the award of $50,000 for past mental anguish is not excessive. "Jurors are best suited to determine whether and to what extent the defendant's conduct caused compensable mental anguish by referring to their own experience." *St. Elizabeth Hospital,* 730 S.W.2d at 654. This portion of point of error four is overruled.

The award for *future* mental anguish, however, is another matter. Both Kneuper and his wife testified, in essence, that a complete resolution of this hardship

hinged on the outcome of the trial. Kneuper testified as follows:

Q: And do you feel that this is having a continuing effect because of this termination?

A: It *has,* yes.

Q: Okay. What will you do now, Mr. Kneuper?

A: I guess right now just wait *pending the outcome of the situation here.* [Emphasis added.]

The effect on Kneuper's life and family seems to have been best summed up in the following testimony of Mrs. Kneuper:

Q: I'd like to ask you now about how that decision and Mr. Kneuper's termination has affected his life and your life together. What kind of effect has this termination from the City had?

A: Well, on our lives, of course, immediately after he was fired it was total panic because since we have seven children and no way to support them, that was a great fear. But then he was put back to work of course under court order, so he did have a job. *After that it was basically just fear of the unknown.* We didn't know what to expect. We didn't know what the future was going to bring. *Everything is going to depend on the outcome of this trial.* [Emphasis added.]

No other portion of their testimony even arguably relates to future mental anguish.

It is a reasonable inference that an inability to advance to higher-paying jobs as quickly as he should will, if it occurs, cause Kneuper some frustration. However, the record is completely devoid of evidence indicating that, in view of Kneuper's reinstatement to his former job, any such frustration would rise to the level of compensable mental anguish. Accordingly, we hold the evidence to be legally insufficient to support the award of $36,000 for future mental anguish. This portion of point of error four is sustained.

Point of error five need not be addressed, since it pertains to the alleged excessiveness of exemplary damages.

For the reasons stated above, the judgment of the trial court is modified to eliminate the award of $300,000 exemplary damages, and to eliminate that portion of the actual damages award which represents the jury's finding of $108,000 lost employee benefits and that portion which represents the jury's finding of $36,000 future mental anguish. As so modified, the judgment of the trial court is affirmed. Costs are taxed one-half against the City and one-half against Kneuper.